UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

FRANK J. BOSLET, JR.,     :   CIVIL NO: 1:13-CV-02532
    Petitioner      :
              :
              :   (Judge Caldwell)
    v.           :
              :   (Magistrate Judge Schwab)
JOHN M. RICHMOND, *et al.*,    :
    Respondents     :

## REPORT AND RECOMMENDATION

### I.  Introduction.

In 2011, the petitioner, Frank J. Boslet, Jr., was convicted in the Court of Common Pleas of Monroe County, Pennsylvania of driving under the influence, and he was sentenced to 30-days to six-months incarceration.   At trial, Boslet's counsel stipulated that Boslet's blood alcohol content (BAC) was .10 percent.   In this habeas corpus case, Boslet claims that his trial counsel provided ineffective assistance of counsel by failing to investigate the testing procedures used by the laboratory that determined his BAC and by stipulating to the results of his BAC test rather than challenging the blood-testing methods.   Boslet also claims that the Commonwealth violated *Brady v. Maryland*, 373 U.S. 83 (1963), by failing to

disclose that, in conducting the testing on his blood, the laboratory used supernatant[1]

testing and did not use a conversion factor.   For the reasons discussed below, we

recommend that the Court deny the petition for a writ of habeas corpus.

## II.   Background and Procedural History.

### A.   Blood and Blood Testing Procedures.

Because this case involves blood-testing procedures in Driving Under the

Influence (DUI) cases, a brief overview of Pennsylvania law in this area is in order.

We begin with *Commonwealth v. Bartolacci*, 598 A.2d 287 (Pa. Super. Ct. 1991).

At the time of *Bartolacci*, the Pennsylvania DUI statute made "it an offense for a

person to operate a vehicle while 'the amount of alcohol by weight in the blood of

the person is 0.10% or greater.'" *Id*. at 288 (quoting 75 Pa.C.S.A. § 3731(a)(4)).[2]

The Superior Court determined that although the Pennsylvania "statutes do not

---

[1] A supernatant is "the usually clear liquid overlying material deposited by settling, precipitation, or centrifugation." Merriam–Webster Dictionary, available at http://www.merriam-webster.com/dictionary/supernatant (last visited May 23, 2016).

[2] 75 Pa.C.S.A. 3731(a)(4) was repealed effective February 1, 2004 and replaced with 75 Pa.C.S.A. 3802. See 2003, Sept. 30, P.L. 120, No. 24, §14 & §16, ALCOHOL AND CONTROLLED SUBSTANCES—INVESTIGATION, PROCUREMENT, AND EDITORIAL CHANGES, 2003 Pa. Legis. Serv. Act 2003-24 (S.B. 8) (PURDON'S).

dictate in what form blood must be tested, only evidence of the amount of alcohol by weight in the person's blood can support a conviction based upon a violation of § 3731." *Id*. at 288 (footnote omitted).   Because there was evidence that tests on blood serum[3] result in a higher blood alcohol content than tests on whole blood,[4] the court held that "[w]here a test is performed on blood serum rather than whole blood, the fact finder must be informed of this and must be provided with evidence of the alcohol by weight in the defendant's blood in order to properly sustain a conviction based upon a violation of § 3731.   Evidence offered of a reading based upon a test of blood serum, without conversion, will not suffice." *Id*.   In *Bartolacci*, the defendant was convicted of Homicide by Vehicle While Under the Influence of Alcohol after the Commonwealth presented an expert who testified about Bartolacci's blood test, which was done on serum rather than whole blood, and who

---

3 Blood serum is "the clear yellowish fluid that remains from blood plasma after clotting factors (as fibrinogen and prothrombin) have been removed by clot formation." Merriam–Webster Dictionary, available at http://www.merriam-webster.com/dictionary/blood%20serum (last visited May 23, 2016).

[4] Whole blood is "blood with all its components (as white and red blood cells, platelets and plasma) intact that has been withdrawn from a donor into an anticoagulant solution." Merriam–Webster Dictionary, available at http://www.merriam-webster.com/medical/whole%20blood (last visited May 23, 2016).

testified that a 15% conversion rate was appropriate. *Id*.   The Superior Court

concluded that from that evidence "the jury was free to conclude that [Bartolacci]'s

whole blood alcohol content at the time of the accident exceeded .10%." *Id*.

Although the Superior Court determined that the Commonwealth had presented

sufficient evidence of Bartolacci's BAC, it "caution[ed] the Commonwealth that a

conviction based upon a violation of § 3731(a)(4) will not be upheld absent clear

evidence that the alcohol content in a defendant's blood is .10% or greater and that

evidence of test results based solely on blood serum will not suffice to sustain a

conviction." *Id*.

 Relying on *Bartolacci*, the Superior Court later held that the tests performed

on blood plasma,[5] as opposed to whole blood, also "require conversion to establish

the correlative whole blood test result." *Commonwealth v. Wanner*, 605 A.2d 805,

809 (Pa. Super. Ct. 1992).   Similarly, the Pennsylvania Superior Court held that

supernatant testing also requires such "converting evidence." *Commonwealth v.*

*Renninger*, 682 A.2d 356, 362 (Pa. Super. Ct. 1996).

---

[5] Blood plasma is the "the pale yellow fluid portion of whole blood that consists of
water and its dissolved constituents including proteins (as albumin, fibrinogen, and
globulins), electrolytes (as sodium and chloride), sugars (as glucose), lipids (as
cholesterol and triglycerides), metabolic waste products (as urea), amino acids,
hormones, and vitamins." Merriam–Webster Dictionary, available at
http://www.merriam-webster.com/dictionary/blood%20plasma (last visited May
23, 2016).

"The requirement of conversion evidence recognizes the scientific fact that 'serum [and plasma and supernatant] is less dense than whole blood, the weight per volume of the alcohol in the serum [or plasma and supernatant] will be greater than the weight per volume in the whole blood.'" *Commonwealth v. Newsome*, 787 A.2d 1045, 1048 (Pa. Super. Ct. 2001) (quoting *Commonwealth v. Michuck*, 686 A.2d 403, 406 (Pa. Super. Ct. 1996)).   "'Thus, an appropriate conversion factor is required to calculate the corresponding alcohol content in the original whole blood sample.'" *Id*.   Further, "[t]he establishment of a conversion factor involves a certain degree of variance due to the differing ratios between serum and whole blood found within the public at large." *Id*. at 1049.   And various conversion factors have been used. *See Id*. (upholding conviction based on a range of conversion factors from 1.1 to 1.35); *Commonwealth v. Michuck*, 686 A.2d 403, 406-407 (Pa. Super. Ct. 1996) (upholding use of conversion factor of 1.18, but vacating conviction on other grounds).

In the years following Boslet's trial, there have been numerous cases in Pennsylvania concerning the conversion of blood-test results.   Those cases have continued to recognize that "'[t]he general rule for alcohol related DUIs is that only tests performed on whole blood will sustain a conviction under Section 3802. Thus, evidence of blood serum, plasma or supernatant testing, without conversion,

5

will not suffice."' *Commonwealth v. Haight*, 50 A.3d 137, 141 (Pa. Super. Ct. 2012)

(quoting *Commonwealth v. Hutchins*, 42 A.3d 302, 309 (Pa. Super. Ct. 2012)); *see

also Commonwealth v. Emigh*, No. 1041 MDA 2013, 2014 WL 10803160, at *8 (Pa.

Super. Ct. Aug. 26, 2014) (reversing convictions of defendants and holding that trial

court erred by allowing the Commonwealth to present evidence of a 1:1 conversion

ratio without expert testimony and by preventing the defendants from presenting

expert testimony); *Commonwealth v. Ramsey*, No. 1461 MDA 2013, 2014 WL

10915524, at *3 (Pa. Super. Ct. July 24, 2014) (affirming conviction based on serum

blood test where the lab technician testified she used conversion factors of 1.35 (low

equivalent) and 1.10 (high equivalent)); *Commonwealth v. Laverty*, No. 256 MDA

2013, 2014 WL 10936635, at *5 (Pa. Super. Ct. May 7, 2014) (affirming conviction

based on plasma blood test where the lab technician testified she used a conversion

factor of 1.05 for the high end and 1.25 for the low end of the range); *Commonwealth

v. Fili*, No. 804 MDA 2013, 2014 WL 10965227, at *5 (Pa. Super. Ct. Apr. 15, 2014)

(reversing conviction where the Commonwealth failed to introduce any evidence of

a conversion factor, rejecting the trial court's contention that previous decisions

requiring a conversion factor were not binding as they did not address the 2004

changes to the DUI statute, rejecting the trial court's characterization of the test on

supernatant as a whole-blood test, reaffirming that it is the Commonwealth's burden

6

to introduce evidence of a scientifically accepted conversion factor when the test is done on supernatant, plasma, or serum, and observing that "[i]f, in fact, a particular test on supernatant produces a result that is equivalent to whole blood testing, then it is the Commonwealth's burden to introduce reliable and scientific evidence of a conversion factor of one or its statistical equivalent"); *Commonwealth v. Brugger*, 205 MDA 2013, 2014 WL 1218834, at *7 (Pa. Super. Ct. Mar. 25, 2014) (stating that "while Pennsylvania law manifestly requires the use of a reliable conversion factor to infer the requisite whole-blood BAC from supernatant BAC results, the source, content, and rigor required of such testimony remain less than clear."); *Commonwealth v. Phillips*, No. 1260 MDA 2012, 2013 WL 11257179, at *2 (Pa. Super. Ct. July 12, 2013) (affirming conviction where Commonwealth's expert testified that the supernatant testing method used in that case was equivalent to the gas chromatography method used to test whole blood such that a conversion factor was "useless," or that "essentially, a one-to-one ratio" was appropriate); *Commonwealth v. Karns*, 50 A.3d 158, 164 (Pa. Super. Ct. 2012) (vacating judgment of sentence because the Commonwealth failed to present evidence of a conversion factor that is generally accepted in the scientific community).

Pursuant to statute, the Pennsylvania Department of Health, "has issued extensive regulations relating to the screening of blood for the presence of alcohol

and controlled substances and the procedures and equipment to be used to conduct such tests." *Commonwealth v. Alterio*, No. 2147 MDA 2013, 2014 WL 10805915, at *4 (Pa.Super. Ct. Aug. 29, 2014).   And the Department of Health publishes in the Pennsylvania Bulletin, "a list of laboratories that are approved to conduct testing for alcohol and/or controlled substances." *Id*. at *5.   Courts may take judicial notice that a laboratory is listed in the Pennsylvania Bulletin as certified by the Pennsylvania Department of Health. See *Renninger*, 682 A.2d at 359.   "[J]udicial notice of the laboratory's certification create[s] a *rebuttable* presumption of validity [of the test results]." *Id*.

### B.   The Charges Against Boslet and Pretrial Proceedings.

Boslet was charged with the following violations of Pennsylvania's Motor Vehicle Code: (1) Driving Under the Influence of Alcohol or Controlled Substance—High Rate of Alcohol—75 Pa.C.S. § 3802(b) ("An individual may not drive, operate or be in actual physical control of the movement of a vehicle after imbibing a sufficient amount of alcohol such that the alcohol concentration in the individual's blood or breath is at least 0.10% but less than 0.16% within two hours after the individual has driven, operated or been in actual physical control of the movement of the vehicle."); (2) Driving Under the Influence—General

8

Impairment—75 Pa.C.S. §3802(a)(1) ("An individual may not drive, operate or be in actual physical control of the movement of a vehicle after imbibing a sufficient amount of alcohol such that the individual is rendered incapable of safely driving, operating or being in actual physical control of the movement of the vehicle."); (3) Following Too Closely—75 Pa.C.S. § 3310(a) ("The driver of a motor vehicle shall not follow another vehicle more closely than is reasonable and prudent, having due regard for the speed of the vehicles and the traffic upon and the condition of the highway."); and (4) Driving on Roadways Laned For Traffic—75 Pa.C.S. § 3309(1) ("A vehicle shall be driven as nearly as practicable entirely within a single lane and shall not be moved from the lane until the driver has first ascertained that the movement can be made with safety."). *Commonwealth v. Boslet,* No. 2748 CR 2010, slip op. at *1 (C.C.P. Monroe Cty Oct. 8, 2013).

### 1. Preliminary Hearing Testimony.

At the preliminary hearing, Patrolman Christopher Staples testified about why his pulled Boslet over and then arrested him.   Staples testified that, on October 31, 2010, after observing a pickup truck traveling at what appeared to be a high rate of speed, he began to follow the pickup truck. *Doc. 29* at 5.   Staples testified that he observed the pickup "weaving within the lane, at times crossing" the "white fog

line." *Id*. at 6 & 29.   He also testified that he observed the pickup truck tailgating a

tractor-trailer—traveling less than a car length behind the tractor-trailer. *Id*. at 6 &

21.   Staples pulled the pickup truck over and made contact with Boslet, the driver.

*Id*. at 6-7.   Staples testified that he smelled alcohol coming from the vehicle and that

Boslet had "glassy bloodshot eyes." *Id*. at 7.   Staples then performed a preliminary

breath test and a series of field sobriety tests, during which, according to Staples,

Boslet showed signs of intoxication. *Id*. at 7 & 32-33.   Staples then arrested Boslet

and took him to the Monroe County DUI Center, where Boslet's blood was drawn

and other officers performed more field sobriety tests on Boslet. *Id*. at 7-8 & 37-38.

## 2.   Boslet's Omnibus Pretrial Motion.

Boslet filed an omnibus pretrial motion challenging the legality of the traffic

stop and of his arrest.   At a hearing on that motion, the Commonwealth did not

present any live testimony; rather, it introduced the transcript of the preliminary

hearing and a lab report. *Doc. 24-1* at 4.   The defense presented three witnesses.

The first witness was Officer Charles Stokes, who is employed at the Monroe

County DUI processing center and who testified about field sobriety tests given to

Boslet at the processing center and about Boslet's answers to questions at that time.

*Id.* at 6, 12-18.   The second witness was Virlaunda Druffner, the lab technician at

the Pocono Medical Center who analyzed Boslet's blood sample. *Id.* at 21.   She

testified about how a blood sample is sealed and labeled when she receives it, and

she testified there was nothing about the sealing and labeling of Boslet's sample

when she received it that caused her concern. *Id.* at 25 & 31.   She was not

questioned about and did not testify about her actual testing of Boslet's blood

sample.   Finally, Boslet testified that the phlebotomist that took his blood ripped the

tape used to seal his sample and then pieced it together to seal his sample. *Id.* at

32-33.

On April 6, 2011, the Honorable Marherita Patti Worthington denied Boslet's

omnibus pretrial motion. *See Doc. 24-3* at 1.

### C.  Boslet's Trial.

Boslet had a bench trial before the Honorable Linda Wallach Miller on May

25, 2011.   Five witnesses testified at the trial.   We briefly summarize their

testimony.   Several exhibits were introduced at trial, only one (the laboratory report

regarding Boslet's BAC) of which is important to the issues in this case.

### 1. Officer Staples.

Similar to his testimony at the preliminary hearing, Officer Staples testified that on October 31, 2010, while on routine patrol, he observed a pickup truck travelling southbound on Route 611 that appeared to be traveling at a high rate of speed. *Doc. 24* at 4.   Staples proceeded to follow the pickup truck to attempt to get an accurate clock on its speed. *Id*.   The pickup then merged onto Interstate 80 and Staples followed. *Id*. at 5.   Staples testified that from that particular ramp, traffic merges into the left lane, and that is what the pickup truck and Staples did. *Id*.

Staples followed the pickup truck in the left lane for a short time, and during that time, the pickup truck was drifting within the lane. *Id*.   According to Staples, the pickup then moved into the right lane, caught up to a tractor-trailer, and began to follow the tractor-trailer at an unsafe distance—at times less than a car length. *Id*. at 5-6.   The pickup truck was also drifting within the lane and crossing the white fog line on the right side of the road. *Id*. at 7.   Staples did not know how many times the pickup truck crossed the fog line, for how many feet the pickup truck crossed the fog line, how far it was over the fog line, or whether its right rear tire, which is the only tire Staples was able to see, even crossed all the way over the fog line. *Id*. at 23-24. At the time the pickup truck was on Interstate 80, it was not speeding; it was travelling 55 miles per hours. *Id*. at 25.   During the time that the pickup truck was

following the tractor-trailer, there was not a lot of other traffic on the road, and there were no adverse weather conditions. *Id*. at 25-26.   Staples testified that the only reason that he thought the pickup truck was travelling too close to the tractor-trailer was that it was traveling 55 miles per hour within one car length of the tractor-trailer. *Id*. at 26.   Staples testified that he followed the pickup for a few tenths of a mile and that the pickup was within one car length of the tractor-trailer for 10 to 20 seconds before he pulled the pickup over. *Id*. at 6-7 & 26.   The stop occurred at approximately 3:16 a.m. *Id*. at 17.

The driver of the pickup, who Staples identified at trial as Boslet, told Staples that he was traveling from the Mount Airy Casino to his home in New Jersey. *Id*. at 8.   Staples detected a strong odor of alcohol on Boslet's breath and observed that he had glassy, bloodshot eyes. *Id*.   Boslet's speech was not slurred. *Id*. at 28.   Boslet told Staples that he had a couple of drinks (wine) at the casino earlier. *Id*. at 8.

Staples then asked Boslet to exit the vehicle, and he performed a series of field sobriety tests—the walk-and-turn, the one-leg-stand, the PBT, and the horizontal-gaze-nystagmus test. *Id*. at 9.   Staples described the walk-and-turn test and testified that Boslet exhibited cues of intoxication, i.e., he could not keep his balance during the instructional period when he had to lift his left foot in front of his right foot, and while performing the test, he missed his heel to toe, he stepped off the

13

line, and at times he used his arms for balance. *Id*. at 10-11.   Staples also described

the one-leg-stand test, and testified that Boslet swayed while balancing, used his

arms for balance, and placed his foot down while counting. *Id*. at 11.   Based on

those tests, Staples concluded that Boslet was under the influence of alcohol to an

extent that he should not be driving. *Id*.   Staples then arrested Boslet and transferred

him to the Monroe County DUI Center. *Id*.

### 2.   Tracy Brown.

Tracy Brown, a phlebotomist at the Monroe County DUI processing center

testified about the procedures she followed in taking Boslet's blood and sealing and

labeling the blood sample. *Doc. 24* at 35-53.   She testified that she drew Boslet's

blood at 4:23 a.m. on October 31, 2010. *Id*. at 40.

### 3.   The Laboratory Report.

After Brown's testimony, the Court took a recess. *Id*. at 53.   When back on

the record, the prosecutor stated: "Based on discussions in chambers, we would like

to admit at this time Commonwealth's Exhibit Nos. 1, 2, 3 and 4.   And

Commonwealth's No. 3 is the lab analysis from Pocono Medical Center that

indicates the defendant's blood alcohol content was .10 percent." *Id.*[6]   Defense

counsel did not object, and the exhibits were admitted. *Id*. at 54.   The prosecutor

then stated: "Just again, so that the record is clear, Pocono Medical Center is

approved by the Pennsylvania Bulletin as an approved testing laboratory for blood

alcohol content analysis." *Id*. at 54.   The Commonwealth then rested. *Id*.


### 4.   Officer Stokes.

The defense then presented its case.   The first defense witness was Officer

Charles Stokes, who worked at the Monroe County DUI processing center and who

performed three field sobriety tests on Boslet at the processing center. *Doc. 24* at

54-57.   As to the first test, the walk-and-turn test, Stokes testified that, on the form

he completed regarding that test, he noted no indicators of intoxication, and although

Boslet had an improper turn, he satisfied all the mandates of that test and the

improper turn was not sufficient to conclude that he failed that test. *Id.* at 58-59.   As

to the second test, the one-leg-stand test, Stokes noted that at 11 to 20 seconds,

Boslet raised his arms, but that he did not fail the test. *Id.* at 59-60.   As to the final

test, the finger-to-nose test, Stokes testified that Boslet touched his nose with his

---

6 Exhibits 1, 2, and 4 were chain-of-custody forms for Boslet's blood sample and
Officer Staples report regarding the results of the field sobriety tests he performed.
*See Doc. 24* at 2, 30, & 36.   Exhibit 3 was not identified in the record prior to this
comment by the prosecutor.

thumb, instead of his index finger as instructed, and because of that, he did not pass

that test. *Id.* at 59-60 & 66.   Stokes conducted these field sobriety tests at

approximately 4:00 a.m. *Id.* at 63-65.

On the form where Stokes could record his observations about Boslet's level

of intoxication, he made no notations. *Id.* at62-63.   He did, however, record on the

form what Boslet said in response to some interview questions. *Id.* at 63.   He noted

that Boslet said that he had four glasses of wine from 9:00 p.m. to 10:00 p.m. *Id.* at

63.

### 5.  Micheal Luvddekd.

The next defense witness was Michael Luvddekd, Boslet's friend who was

with Boslet at the Mount Airy Casino on the night in question. *Id.* at 67-68.

Although Luvddekd was not with Boslet the entire time that Boslet was at the

casino, he ate dinner with Boslet at the casino and he observed Boslet drinking wine

with dinner, which ended about 10:15 or 10:30 p.m. *Id.* at 69.   Luvddekd testified

that he did not notice Boslet drinking any alcohol after dinner. *Id.*   Luvddekd and

Boslet walked out of the casino together at about 3:00 a.m., and, according to

Luvddekd, Boslet did not have glassy eyes, he was not slurring his speech, and he

was not unsteady on his feet. *Id.* at 72.   Boslet and Luvddekd left the casino in

separate vehicles, with Luvddekd's vehicle behind Boslet's vehicle. *Id.* at 69-70. According to Luvddekd, during the approximately 15 miles that he followed Boslet's vehicle, he did not notice Boslet driving in a manner that would cause him alarm and he did not see Boslet swerving or crossing the fog line or the center line of the road. *Id.* at 71.   Luvddekd testified that he turned off at a gas station before Boslet entered Interstate 80. *Id.* & 74.

### 6.   Boslet.

Boslet was the final witness to testify.   He testified that he was with Luvddekd at the Mount Airy Casino on October 31, 2010, and the two ate dinner between 9:00 p.m. and 10:30 p.m., during which time Boslet drank approximately four glasses of wine. *Id.* at 75-76.   After dinner, Boslet and Luvddekd retuned to the casino floor, and, according to Boslet, he did not have any further alcoholic beverages. *Id.* at 76.   He testified that he and Luvddekd walked out of the casino together and got in separate cars. *Id.* at 77.   Boslet testified about his route home, and when he first noticed Officer Staples's police car. *Id.* at 78-79.   He testified about the field sobriety tests that Officer Staples performed, and he believed that as to the walk-and-turn test, he did not have any problem with his balance. *Id.* at 80. As to the one-leg-stand test, Boslet testified that Officer Staples started to perform

the test and then he said hold it, and that is when he put his leg down. *Id.*.   After that

he restarted the test and completed it. *Id.*

Following, Boslet's testimony, the defense moved, without objection, for the

admission of the defense exhibits, which were forms completed by Officer Stokes

relating to the field sobriety tests and the interview of Boslet at the DUI processing

center. *Id.* at 56, 61, & 84.   The defense then rested. *Id.* at 84.

**7.   The Verdict.**

Judge Miller then found Boslet not guilty of all the charges except Driving

Under the Influence of Alcohol or Controlled Substance—High Rate of

Alcohol—75 Pa.C.S. § 3802(b).   She set forth her reasoning:

> The defendant has been charged with five counts in the
> Information, all violations of the Motor Vehicle Code.   There
> are three summary counts, Counts 3, 4 and 5, which are
> violations of Section 3310 and two violations of 3309.
> I have heard no testimony which convinces me beyond a
> reasonable doubt that the defendant violated any of those
> sections of the Vehicle Code, so I am finding the defendant not
> guilty as to Counts 3, 4 and 5.
> Count 2 charges the defendant with driving under the
> influence to a degree which rendered him incapable of safe
> driving.   The only evidence I have heard from the
> Commonwealth as to unsafe driving is one rear tire over the fog
> line.   I don't have them at my fingertips, but I know there are
> Superior Court cases that say that is not enough, so I am finding
> the defendant not guilty of Count 2.

Count 1 charges that the defendant operated a vehicle
while the amount of alcohol by weight in his blood was .10 but
less than .16, and in this case, the amount of alcohol by weight of
the defendant as shown by the laboratory test was .10 percent.
That is evidence that has been shown beyond a reasonable doubt,
and therefore, I am finding the defendant guilty of Count 1 of the
Information only.

*Doc. 24* at 84-85.

### D.   Boslet's Sentence and Appeal.

In June of 2011, Boslet was sentenced to 30-days to six-months incarceration.

*Doc. 22-1*.   His sentence was deferred, however, pending the outcome of his appeal.

*Id*.

On appeal, Boslet claimed that the suppression court erred by denying his

motion challenging the legality of the traffic stop and the legality of his arrest. *See*

*Commonwealth v. Boslet*, No. 2262 EDA 2011, slip op. at *3-4 (Pa. Super. Ct. June

21, 2012).   Based on Officer Staples's testimony that he observed Boslet traveling

at a high rate of speed, cross the white fog line, and follow a tractor-trailer at a

distance of less than car length, the Superior Court concluded that Officer Staples

had probable cause to stop Boslet's vehicle. *Id.* at *7-8.   Further, based on Officer

Staples's testimony that after he stopped Boslet and approached him, he detected a

strong odor of alcohol and noticed that Boslet's eyes were glassy and bloodshot, and

19

Officer's Staples's testimony regarding Boslet's performance on the field sobriety

tests, the Superior Court concluded that Officer Staples had probable cause to arrest

Boslet for driving under the influence of alcohol to a degree that rendered him

incapable of safe driving. *Id.* at *8-9.   The Superior Court, thus, affirmed Boslet's

judgment of sentence. *Id.* at 9.

Boslet began serving his sentence in April of 2013. *Doc. 22-2.*   A short time

later, in May of 2013, he was paroled. *Doc. 22-3* at 3, ¶16.


### E.   PCRA Proceedings.

In September of 2013, Boslet filed a Post-Conviction Relief Act (PCRA)

petition, or, in the alternative, a petition for a writ of coram nobis. *Doc. 22-3.*   In

that petition, Boslet claimed that his trial counsel was ineffective by failing to

properly investigate the procedures that the Pocono Medical Center used to test his

blood and by stipulating to the admissibility of the test results from the Pocono

Medical Center. *Id.* at 4-5.   Boslet asserted that had his trial counsel investigated

Pocono Medical Center's testing procedures, he would have discovered that the

Pocono Medical Center uses a supernatant-testing method, which requires a

conversation factor, and if defense counsel would have called the lab technician who

tested Boslet's blood, he would have been able to show that the technician was

unable to provide a conversion factor. *Id*. at 5-6.   Boslet also claimed that the

Commonwealth violated *Brady* by failing to disclose that the Pocono Medical

Center was using supernatant testing and that the Pocono Medical Center's

laboratory does not provide a conversion factor. *Id*. at 6.   In his request for a petition

for a writ of coram nobis, Boslet claimed that at trial, defense counsel and the

prosecuting attorney were both unaware, through no fault of their own, that if called

to testify, the laboratory technician would have testified that Boslet's blood was

subject to serum-based testing and that she would have been unable to provide a

conversion factor.   In this regard, Boslet alleged that at the time of trial, the Pocono

Medical Center's testing was "unquestioned by the Commonwealth and the methods

used by the laboratory as listed in the Pennsylvania Bulletin were listed under serum,

plasma and whole blood testing facilities." *Id*. at 9.   Therefore, according to Boslet,

"the Commonwealth always presumed that the tests performed at Pocono Medical

Center were performed on 'whole blood,' and Defendants were informed of the

results of the whole blood test without being informed of the nature of the test." *Id*.

Boslet asserts that in a later, unrelated trial, the same lab technician that tested his

blood testified that the testing method used is a serum method, but the lab tech was

not able to provide a conversion factor. *Id*.   And, according to Boslet, if that lab tech

had been called at his trial, the proper foundation for the admissibility of the blood

results would not have been established and he would have been acquitted on the
blood alcohol charge. *Id*.

### 1. The Hearing.

On September 26, 2013, the Honorable Arthur L. Zulick held a hearing on
Boslet's PCRA/coram nobis petition.   Although Boslet raised both
ineffective-assistance-of-counsel claims and a *Brady* claim in his petition, at the
hearing, Boslet's counsel stated that the case was "mainly an ineffectiveness case,"
and he did not argue his *Brady* claim. *Doc. 19-3* at 3 and 39-50.   Two witnesses
testified at the hearing.

### a. Virlaunda Druffner.

First, Virlaunda Druffner, a lab tech at the Pocono Medical Center, testified
about the process she used to test Boslet's blood. *See Doc. 19-3* at 9-14.   As the
PCRA Court aptly summarized her testimony: "To perform the test, she removed
300 microliters of blood from the Boslet blood sample, added 300 microliters of a
denaturer to the sample and placed the sample in a centrifuge.   The centrifuge
separated the proteins from the blood, and gave her a supernatant, upon which she
performed the blood-alcohol concentration tests." *Doc. 22-4* at 3.   Druffner also

testified that she programmed the analyzer that is used to test the blood to use a

delusion factor of two to make up for the amount of liquid that was added to the

whole blood sample. *Doc. 19-3* at 13-14.   From Druffner's testimony, it is not clear

whether she thought the delusion factor was the same as a conversion factor:

> Q:   So when you are saying that the machine is
> programmed for the delusion factor, that's to make up for the
> amount of liquid that was added to that whole blood sample?
> A:   Yes.
> Q:   And that's by a factor of 2?
> A:   It is two, because it's a two delusion.
> Q:   So you program the machine for that?
> A:   Uh-huh.
> Q:   Is there any other—are there any other adjustments
> that you make in the machine?
> A:   No.
> . . .
> Q: Now, it doesn't sound like there was any conversion
> factor that was ever put into that machine?
> A:   No.
> Q:   So the way you describe the test, you do not believe
> you would need a conversion factor; is that correct?
> A:   No, there's conversion, you are just using a delusion.

*Doc. 19-3* at 13-14.   Druffner testified that if she would have been called to testify

at Boslet's trial, she would have testified the same as she did at the PCRA hearing.

*Id.* at 14-15.

On cross-examination, Druffner testified that the Pocono Medical Center is

listed in the Pennsylvania Bulletin as an approved testing site, and the PCRA Court

23

took judicial notice that the Pocono Medical Center is an approved blood-testing

site. *Id*. at 16.[7]   Druffner testified that the Pocono Medical Center conducts two

different types of blood tests: legal and medical. *Id*. at 17.   According to Druffner, a

"medical test" is done on plasma, is faster, there is no delusion factor for the

supernatant, and there are no chain-of-custody requirements. *Id*. at 17-18.   Druffner

also testified about the reports she prepared regarding the test on Boslet's blood, and

she testified that his blood sample was intact and satisfactory when she tested it. *Id*.

at 19-20.   Druffner testified that she determined Boslet's BAC to be 0.108 percent,

and that if she had been called to testify at Boslet's trial, she would have so testified

to a reasonable degree of scientific certainty. *Id*. at 20-21.

On redirect examination, Druffner testified that she does not do any

adjustments to make up for the volume of material—"red blood cells, white blood

---

[7]  We note that in asking the court to take judicial notice of the Pennsylvania
Bulletin, the prosecutor cited to Volume 39 (dated Jan. 3, 2009) and Volume 43
(dated January 5, 2013) of the Pennsylvania Bulletin. *See Doc. 19-3* at 16.   Both of
those volumes, like Volume 40 (dated July 3, 2010) (which appears to be closest in
time to the blood analysis in this case), contain a notice listing "Laboratories
Approved to Determine Blood Alcohol Content under the Clinical Laboratory Act,
the Vehicle Code, the First and Boat Code, and the Game and Wildlife Code." 39
Pa.Bull. 74, See 40 Pa.Bull. 3723, 43 Pa.Bull. 81.   And all provide that the
laboratories listed are licensed and approved by the Department of Health "to
perform alcohol analysis of blood and/or serum and plasma." *Id*.   And all include
the Pocono Medical Center Lab on the list, and all include the notation "SB" next to
the Pocono Medical Center Lab, which means "approved for serum, plasma and
blood analysis." 39 Pa.Bull. 75 & 79, 40 Pa.Bull. 3724 & 3729, 43 Pa.Bull. 82 & 87.

cells, bacteria, . . . proteins"—that were spun out and discarded before the test is

performed. *Id*. at 22-23.

### b.   Robert Patterson, Esquire.

Second, Robert C. Patterson, Esquire, who was Boslet's trial counsel,

testified. *Doc. 19-3* at 23-37.   He testified that he had subpoenaed the lab tech from

the Pocono Medical Center and he intended to call her. *Id*. at 25-26.   But after a

conference with the judge in her chambers, he decided to stipulate that Boslet's BAC

was .10. *Id*. at 25.   He explained why he did so:

> Before I called the lab tech and in an in
> chambers-conference with the Judge, essentially my
> understanding was, and, again, nothing specific was said, I left
> that conference with the understanding by the Judge or the
> impression that the Judge was going to find Mr. Boslet not guilty
> as the evidence stood right then before we were called into
> conference, that the Judge was going to find Mr. Boslet not
> guilty of general impairment and not guilty to two traffic
> citations that were in support of the stop, they were following too
> closely and failure to drive in roadway laned for traffic.
> Based upon that inference I got from the Judge—again,
> I've been in plenty of nonjury bench trials where the Judge might
> allude to a certain disposition.   I felt based on that it would be in
> my client's best interest to stipulate, not put on any testimony, to
> stipulate to the BAC, and, again, it was my intention to
> cross-examine the lab tech.   For the reason—he had the general
> impairment and the suppression court judge already ruled that it
> was a lawful stop.    If I was going to get a finding of not guilty
> on a general impairment, not guilty on two traffic citations in
> support of the stop that led to the blood draw, I'd have the best

position in Superior Court to again challenge the legality of the
stop.   So a judgment call was made on my belief that the Judge
was going to proceed in that fashion based upon our in-chambers
conference.

*Id*. at 26-27.

Patterson testified that he did not know what type of tests were done at the

Pocono Medical Center on Boslet's blood; the district attorney did not inform him

that the test was only a supernatant test. *Id*. at 27.   Although Patterson had intended

to call the lab tech at trial and question her about whether the procedures and

protocols of the Pocono Medical Center were followed, he had not intended to get

into whether the blood test was performed on whole blood or serum. *Id*. at 27-29 &

34.   In other DUI cases that Patterson had defended, the focus was on whether the

blood was tested in accordance with the accepted practice that was used in that

county, not whether the test was on whole blood, and that is how he viewed Boslet's

case as well. *Id*. at 29-30.   According to Patterson, had he known that the Pocono

Medical Center tested just the supernatant, he would have explored that and "then

combat the general impairment with the bad stop." *Id*. at 30.   Patterson also

admitted, however, that he did not know whether a conversion factor would be

needed if the blood test was not done on whole blood. *Id*. at 37.

Patterson further testified that Boslet needed a not-guilty verdict on all charges because he had a prior DUI offense, and if he got a second DUI offense, he would lose his job as a harbor pilot. *Id*. at 32.   According to Patterson, after the in-chambers conference with the judge, he thought his best chance to clear Boslet of all the charges, was to stipulate to the BAC and take a guilty verdict on the charge of DUI-High Rate of Alcohol, get not-guilty verdicts on the general impairment and traffic charges, and then challenge the DUI-High Rate of Alcohol conviction in Superior Court by challenging the legality of the stop. *Id*. at 33.   According to Patterson, he thought the not-guilty verdict on the traffic charges would somehow strengthen his appellate challenge to the initial stop:

> Then I thought I can go into Superior Court with a not guilty of the traffic citations in support of the stop from a trial judge who found him not guilty beyond a reasonable doubt of the general impairment and the traffic tickets.
> Then, obviously, through the poisons [sic] tree then I believe you guys would probably have to suppress the BAC because of an unlawful stop.   Unfortunately, which I still can't understand, the Superior Court sided with the suppression court judge saying the stop was lawful.
> . . .
> That is what I based my strategy on, because if he was found not guilty the BAC and guilty to general impairment with the two traffic citations, I would have absolutely no shot in Superior Court, because, obviously, then there would be two findings, the one by the suppression court judge saying the stop was lawful and then a finding of guilty beyond a reasonable doubt by the trial court judge of general impairment and two

27

traffic citations, and then I would have absolutely no shot in
Superior Court for an unlawful stop.

*Id*. at 33-34.


## 2.   The Decision.

Construing the PCRA petition as raising only an issue of ineffective

assistance of counsel, on October 8, 2013, Judge Zulick denied the petition. *Doc.*

*22-4*.   After reviewing Druffner's testimony and finding that she performed

blood-alcohol concentration tests on the supernatant that she obtained after the

centrifuge separated the protein from Boslet's blood, Judge Zulick concluded that

Boslet's contention that the testing, standing alone, was insufficient to support his

conviction had arguable merit:

> In *Commonwealth v. Renninger*, 682 A.2d 356 (Pa. Super.
> 1996), our superior court addressed supernatant testing in DUI
> cases, stating:
>> Although our courts have not specifically
>> considered the validity of supernatant testing, we do
>> not hesitate to find that *Bartolacci* and *Wanner* render
>> such testing invalid unless converting evidence is
>> provided to establish the alcohol content of whole
>> blood.   Since all three tests "are performed on only a
>> portion of whole blood, [they] require conversion to
>> establish the correlative whole blood test results",
>> *Wanner*, *supra*, and we now hold that supernatant
>> testing also requires such "converting evidence." *Id*.
>> In light of the absence of such evidence presented at
>> appellee's trial, we are constrained to agree with the

28

> trial court that appellee successfully rebutted the
> presumption of validity established when the court
> took judicial notice of the laboratory's certification.
> *Renninger*, 682 a.2d at 362.   Because supernatant testing alone
> cannot serve as the basis for a valid DUI conviction under
> Pennsylvania law, and such a test was employed by the
> Commonwealth in this case, Mr. Boslet claims that the testing of
> the supernatant of his blood, standing alone, was insufficient to
> support his conviction.   This claim has arguable merit.

*Doc. 22-4* at 3.   But Judge Zulick concluded that Boslet had not shown either that

Patterson's strategy was not reasonable or that he was prejudiced by that strategy.

He reviewed Patterson's testimony and concluded that Patterson's strategy was

reasonable:

> Next, the court must examine whether the strategy
> employed by Mr. Boslet's trial attorney had a reasonable basis.
> At the PCRA hearing, Mr. Boslet's trial attorney, Robert
> Patterson, explained his strategy.   He stated that he felt, based
> on remarks by Judge Miller, that there was a strong probability
> that Mr. Boslet would be found not guilty on the general
> impairment and moving violation charges.   He felt that
> attacking the BAC test would undermine his position with Judge
> Miller and might heighten the risk that his client would be found
> guilty on all charges.   He felt that attacking the BAC was futile,
> as even if he were successful, the Judge could still find Mr.
> Boslet guilty of DUI-general impairment. *See, e.g.*
> *Commonwealth v. Mobley*, 14 A.3d 8878 (Pa. Super. 2011) (no
> BAC value is necessary in order to convict a defendant of a
> general impairment DUI).   Further, Attorney Patterson felt that
> he had a strong chance on appeal of overturning Mr. Boslet's
> conviction of the BAC-based DUI conviction based upon the
> alleged illegality of the traffic stop, which was the basis of
> Boslet's omnibus pre-trial motion.   He felt that it would be

easier to bring that appeal to a successful conclusion if Mr.
Boslet's only conviction was for the BAC-related DUI.
Attorney Patterson did pursue this strategy on Boslet's appeal,
but it was unsuccessful.

 While examining Attorney Patterson's trial strategy with
the benefit of hindsight may show a sub-optimal result, this does
not mean that his assistance was ineffective.   The strategy
employed by Attorney Patterson had a "reasonable basis
designed to effectuate his client's interests." *Montalvo*, 641 A.2d
at 1187.   When the court concludes that "the particular course
chosen by counsel had some reasonable basis, [the] inquiry
ceases and counsel's assistance is deemed effective."
*Commonwealth v. Hull*, 982 A.2d 1020, 1023 (Pa. Super. 2009).

*Id*. at 3-4.   Judge Zulick also concluded that Boslet had not shown that he was

prejudiced by Patterson's trial strategy because he had not shown that but for

Patterson's failure to challenge the BAC test there is a reasonable probability that he

would have been found not guilty of DUI-High Rate of Alcohol. *Id*. at 5.   In that

regard, he reasoned that although the Commonwealth cannot convict a defendant

"solely on a blood test that is not of the whole blood," supernatant testing may

support a conviction when expert testimony is introduced which establishes a

conversion factor. *Id*.   Judge Zulick found that there was no evidence regarding

whether the Commonwealth would have been able to provide such testimony:

 The Commonwealth would have had the same opportunity
to present expert testimony as to an appropriate conversion
ratio in this case.   The Commonwealth was not required to
provide a witness at trial because Boslet's BAC was offered by
stipulation.   Mr. Boslet made no showing at the PCRA hearing

that the Commonwealth would have been unable to present a
conversion ratio were the supernatant testing an issue and the
BAC not stipulated to.

*Id*. at 6.

On October 8, 2013, Judge Zulick denied Boslet's PCRA Petition. *Id*. at 8.

### F.   This Habeas Corpus Case, the Stay, and the Superior Court's Decision.

On the same day that his PCRA petition was denied—October 8, 2013—

Boslet, through counsel, filed a petition for a writ of habeas corpus pursuant to 28

U.S.C. § 2254 in this Court.   He claims that trial counsel was ineffective by failing

to investigate testing procedures and by stipulating to the results of his blood test

rather than challenging the blood testing methods.   He also claims that the

Commonwealth violated *Brady v. Maryland*, 373 U.S. 83 (1963), by failing to

disclose that, in conducting the testing on his blood, the Pocono Medical Center used

supernatant testing and did not use a conversion factor.   Boslet asserted that he filed

the petition before appealing the PCRA decision because his last day under parole

supervision would be October 9, 2013.

The respondent filed a response to the petition asserting that Boslet failed to

exhaust state remedies and that Boslet did not meet the "in custody" requirement of

28 U.S.C. § 2254.   Boslet then filed a motion to stay this habeas case while state

court proceedings were pending.   He asserted that under present Pennsylvania law,

Pennsylvania appellate courts lose jurisdiction to hear an appeal in a PCRA case

once the petitioner is no longer serving his sentence, even if the petition was filed

before the expiration of the sentence.   Nevertheless, he asserted, he filed an appeal

to the Pennsylvania Superior Court in an attempt to change existing law on the issue.

He sought a stay of the habeas corpus case in this court pending that state appeal.

According to Boslet, he filed the present habeas corpus case in this Court prior to

seeking appellate review in the Pennsylvania Courts because if he had waited he

would not have been able to satisfy the "in custody" requirement of § 2254.

We stayed this habeas corpus case pending Boslet's exhaustion of remedies in

state court, and we ordered Boslet to provide periodic status reports regarding the

state proceedings.   Concluding that since Boslet was no longer serving his sentence

and was thus ineligible for PCRA relief, the Pennsylvania Superior Court affirmed

the PCRA court's dismissal of Boslet's PCRA petition, and, on January 21, 2015,

the Pennsylvania Supreme Court denied Boslet's petition for allowance of appeal.

*See Docs. 19-1* and *19-2*.

Boslet then filed a motion to lift the stay in this case.   We granted that

motion, lifted the stay, and ordered Boslet to file a reply to the respondent's response

to the petition.   Boslet then filed a reply asserting that he was in custody at the time

that he filed this habeas case[8] and that the has now exhausted state remedies. By an

Order dated April 17, 2015, we ordered the respondent to file an answer to the

petition in accordance with Rule 5 of the Rules Governing § 2254 Cases in the

United States Courts. That Order also provided that Boslet may filed a reply to that

answer within 14 days of the date on which the respondent's answer is filed. The

respondent then filed an answer asserting that Boslet's ineffective-assistance-

of-counsel claim was without merit, that Boslet failed to exhaust his *Brady* claim,

and that, in any event, the *Brady* claim is without merit. After being ordered to do

so by the Court, Boslet file a reply.

## III.   Boslet Procedurally Defaulted the *Brady* Claim.

A state prisoner must exhaust available state remedies before filing a petition

for a writ of habeas corpus in federal court. 28 U.S.C. § 2254(b) and (c). If a claim

has not been fairly presented to the state courts but state law clearly forecloses

review, exhaustion is excused. *Carpenter v. Vaughn*, 296 F.3d 138, 146 (3d Cir.

---

[8]   At the time that Boslet filed his petition in this case, he was serving a parole term
following his sentence. Thus, he met the "in custody" requirement. *Jones v.
Cunningham*, 371 U.S. 236, 240-43 (1963) (holding that parole constitutes custody);
*Spencer v. Kemna*, 523 U.S. 1, 7 (1998) (stating that all the "in custody" provision of
28 U.S.C. § 2254 requires is that the petitioner be "in custody" at the time the
petition is filed).

2002); *See also McCandless v. Vaughn*, 172 F.3d 255, 260 (3d Cir. 1999) ("When a claim is not exhausted because it has not been 'fairly presented' to the state courts, but state procedural rules bar the applicant from seeking further relief in state courts, the exhaustion requirement is satisfied because there is 'an absence of available State corrective process.'").    The issue then becomes one of procedural default.    A procedural default occurs when a prisoner's claim is barred from consideration in the state courts by an "independent and adequate" state procedural rule. *Martinez v. Ryan,* 132 S.Ct. 1309, 1316 (2012).    A procedural default generally bars a federal court from reviewing the merits of a habeas claim that the prisoner procedurally defaulted in state court. *Id.; Munchinski v. Wilson,* 694 F.3d 308, 332 (3d Cir. 2012). There are, however, exceptions to the bar on consideration of procedurally defaulted claims. *Martinez,* 132 S.Ct. at 1316.    A federal court may consider the merits of a procedurally defaulted habeas claim in only two situations: (1) the petitioner establishes cause for the default and actual prejudice as a result of the alleged violation of federal law; or (2) the petitioner demonstrates that failure to consider the claim will result in a fundamental miscarriage of justice. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).

Boslet concedes that he procedurally defaulted his *Brady* claim. *See Doc. 25*. And he does not argue that his default is excused under the cause-and-prejudice or

the fundamental-miscarriage-of-justice exception to the bar on consideration of procedurally defaulted claims.   Accordingly, we do not consider Boslet's procedurally defaulted *Brady* claim.

## IV.   The Ineffective Assistance of Counsel Claim.

### A.   De Novo Standard.

In addition to overcoming procedural hurdles, a state prisoner must generally meet exacting substantive standards in order to obtain habeas corpus relief.   As amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 28 U.S.C. § 2254 limits the power of a federal court to grant a state prisoner's petition for a writ of habeas corpus. *Cullen v. Pinholster,* 563 U.S. 170, 181 (2011). A federal court may not grant habeas corpus relief with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication

> (1) resulted in a decision that was contrary to, or involved an
> unreasonable application of, clearly established Federal law, as
> determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable
> determination of the facts in light of the evidence presented in
> the State court proceeding.

28 U.S.C. § 2254(d).

The standard under Section 2254(d) is highly deferential and difficult to meet. *Cullen,* 563 U.S. at 181.   It "reflects the view that habeas corpus is a 'guard against

extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." *Harrington v. Richter,* 562 U.S. 86, 102-103 (2011) (quoting *Jackson v. Virginia,* 443 U.S. 307, 332 n.5 (1979) (Stevens, J., concurring in judgment)).   State courts are presumed to know and follow the law, *Woods v. Donald,* 135 S.Ct. 1372, 1376 (2015), and Section 2254(d) "'demands that state-court decisions be given the benefit of the doubt.'" *Cullen,* 563 U.S. at 181 (quoting *Woodford v. Visciotti,* 537 U.S. 19, 24 (2002)).

But the highly deferential standard of § 2254(d) applies only to claims that have been "adjudicated on the merits" in the state court. *Han Tak Lee v. Glunt*, 667 F.3d 397, 403 (3d Cir. 2012).   "[I]f the state court did not reach the merits of the federal claims, then they are reviewed *de novo*." *Id.*   A claim has been "adjudicated on the merits" under Section 2254(d), "when a state court has made a decision that 1) finally resolves the claim, and 2) resolves the claim on the basis of its substance, rather than on a procedural, or other, ground." *Thomas v. Horn*, 570 F.3d 105, 115 (3d Cir. 2009).   Further, to be an "adjudication on the merits," the state court decision must finally resolve the claim, which means is must have "preclusive effect." *Id*.   Where an appellate court decides a case on purely procedural grounds, a lower court decision on substantive grounds is stripped of its preclusive effect. *Id*. In other words, a claim has not been "adjudicated on the merits" under 28 U.S.C.

§ 2254(d), and thus the deferential standard of review under that section does not apply, when "a lower state court decided the claim on the merits, but the reviewing state court resolved the claim entirely on procedural grounds." *Id*. at 114.

Here, the PCRA Court decided Boslet's ineffective-assistance-of-counsel claim on the merits, but the Superior Court decided the appeal on purely procedural grounds—i.e., because Boslet was no longer serving his sentence, he was ineligible for PCRA relief.   The Superior Court's procedural ruling stripped the PCRA Court's substantive decision of preclusive effect.   Thus, Boslet's claim has not been "adjudicated on the merits," and so the deferential standards under §2254(d) do not apply. *See Tierno v. Dist. Attorney of Luzerne Cty.*, No. 3:13-CV-02862, 2014 WL 6473218, at *5 (M.D. Pa. Nov. 18, 2014) (reviewing de novo an ineffective-assistance-of-counsel claim that was addressed on the merits by the PCRA Court but dismissed by the Superior Court because the petitioner he was no longer in custody and, thus, not eligible for PCRA relief).

When, as here, the state court has not adjudicated a claim on the merits, the habeas court conducts a "de novo review over pure legal questions and mixed questions of law and fact." *Thomas*, 570 F.3d at 113 (quoting *Appel v. Horn*, 250 F.3d 203, 210 (3d Cir. 2001)).   But we must still presume that the state court's factual determinations are correct, and the petitioner has "the burden of rebutting the

37

presumption of correctness by clear and convincing evidence." 28 U.S.C.

§ 2254(e)(1).


### B.   Ineffective-Assistance-of-Counsel Standards.

The Sixth Amendment provides that "[i]n all criminal prosecutions, the

accused shall enjoy the right . . . to have the assistance of counsel for his defence."

U.S. Const. amend VI.   The purpose of the right to the assistance of counsel is to

ensure a fair trial, and "the Court has recognized that 'the right to counsel is the right

to the effective assistance of counsel.'" *Strickland v. Washington,* 466 U.S. 668, 686

(1984) (quoting *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970)).   "The

benchmark for judging any claim of ineffectiveness must be whether counsel's

conduct so undermined the proper functioning of the adversarial process that the

trial cannot be relied on as having produced a just result." *Id.*   "The Sixth

Amendment guarantees reasonable competence, not perfect advocacy judged with

the benefit of hindsight." *Yarborough v. Gentry*, 540 U.S. 1, 8 (2003).   The clearly

established federal law as to an ineffective-assistance claim is the standard set forth

in *Strickland,* 466 U.S. at 687, which requires a two-part analysis.

Under the first prong of *Strickland*, the petitioner must establish that counsel's

performance was deficient. *Id.* at 687.   To do so, he must establish that "counsel's

representation fell below an objective standard of reasonableness." *Id.* at 688.

"Judicial scrutiny of counsel's performance must be highly deferential." *Id.* at 689.

As such, the court "must apply a 'strong presumption' that counsel's representation

was within the 'wide range' of reasonable professional assistance," *Harrington*,

562 U.S. at 104 (quoting *Strickland,* 466 U.S. at 689), and "[t]o overcome that

presumption, a defendant must show that counsel failed to act 'reasonabl[y]

considering all the circumstances.'" *Cullen,* 563 U.S. at 189 (quoting *Strickland,*

466 U.S. at 688).   "The challenger's burden is to show 'that counsel made errors so

serious that counsel was not functioning as the 'counsel' guaranteed the defendant

by the Sixth Amendment.'" *Richter,* 562 U.S. at 104 (quoting *Strickland,* 466 U.S. at

687).

　　Under the second prong of *Strickland*, the petitioner must establish prejudice.

*Strickland,* 466 U.S. at 687.   To do so, the petitioner must show a reasonable

probability that, if not for counsel's errors, the result of the proceeding would have

been different. *Id.* at 694.   The petitioner "need not prove that the evidence would

have been insufficient if not for counsel's errors . . . [or] 'that counsel's deficient

conduct more likely than not altered the outcome.'" *Saranchak v. Sec'y, Pa. Dep't of

Corr.*, 802 F.3d 579, 588 (3d Cir. 2015) (quoting *Strickland,* 466 U.S. at 693).

Rather, the issue is whether there is a reasonable probability of a different result.

"A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland,* 466 U.S. at 694.   "That requires a 'substantial,' not just 'conceivable,' likelihood of a different result." *Cullen,* 563 U.S. at 189 (quoting *Harrington,* 562 U.S. at 112).   "Further, the prejudice inquiry focuses on 'the effect the same evidence would have had on an unspecified, objective factfinder' rather than a particular decisionmaker in the case." *Saranchak*, 802 F.3d at 588 (citation omitted).

To prevail on an ineffective-assistance claim, a petitioner must satisfy both prongs of *Strickland*.   But a court can choose which prong of the standard to apply first, and it may reject an ineffectiveness claim on the ground that the petitioner was not prejudiced without addressing whether counsel's performance was deficient. *Strickland,* 466 U.S. at 697.   "Surmounting *Strickland*'s high bar is never an easy task." *Padilla v. Kentucky,* 559 U.S. 356, 371 (2010).   "Even under *de novo* review, the standard for judging counsel's representation is a most deferential one." *Premo v. Moore*, 562 U.S. 115, 122 (2011).

## C.  Discussion.

### 1.  Counsel's Peformance.

To establish that his trial counsel—Patterson—was ineffective, Boslet must

show that Patterson's performance was deficient.   Judge Zulick determined that Patterson's performance was not deficient.   In this regard, he found that Patterson had a strategy.   That is a finding of fact to which the presumption of correctness under 28 U.S.C. § 2254(e)(1) applies. *See Berryman v. Morton,* 100 F.3d 1089, 1095 (3d Cir.1996).   And Boslet has not rebutted that presumption by clear and convincing evidence.   Thus, we accept that Patterson had a strategy.

Judge Zulick determined that Patterson's strategy was reasonable.   That is, however, a legal determination to which the presumption of correctness does not apply. *Id.* at 1096 ("Once counsel is found to have had a strategy, the reasonableness of that strategy is a mixed question of fact and law to which the presumption of correctness does not attach.").   Thus, we review that determination de novo.

Giving Patterson the benefit of the doubt and employing a strong presumption that his strategy was reasonable, we are nevertheless constrained to conclude that his strategy of stipulating to the BAC, which necessarily had the effect of ensuring a conviction on the DUI-High Rate of Alcohol, and of hoping to overturn that conviction on appeal based on an illegal stop, was not reasonable.

Whether Patterson's decision to stipulate to the BAC was a reasonable attempt to obtain an eventual favorable outcome on all charges depends, at least in part, on whether his hope to overturn the conviction on appeal by challenging the

stop and arrest was reasonable.   But given Officer Staples's testimony regarding his observation of Boslet's driving, the case for reversal of the suppression court's determination that the traffic stop was legal was not an easy or certain one.   And Officer Staples's testimony regarding his observation of Boslet during the stop—the smell of alcohol, glassy, bloodshot eyes—and his testimony regarding Boslet's performance on the field sobriety tests—certainly provided probable cause for Boslet's arrest.   Thus, it is difficult to see how Patterson could have believed he had a good chance at overturning the conviction based on the legality of the initial stop and of the arrest.

Patterson nevertheless thought that, after the in-chambers conference with the trial judge, the best strategy for eventually obtaining a favorable determination for Boslet on all claims was to stipulate to the BAC.   We must be mindful of the deference we owe Patterson's decisions:

> In scrutinizing counsel's performance, we "must be highly deferential," and refrain from "second-guess[ing] counsel's assistance after conviction or adverse sentence, [as] it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable."   We must "eliminate the distorting effects of hindsight," and "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."
> 
> . . .

> [E]ven under a *de novo* review of *Strickland,* counsel's
> representation should be judged under a "most deferential"
> standard because, "[u]nlike a later reviewing court, [trial
> counsel] observed the relevant proceedings, knew of materials
> outside the record, and interacted with the client, with opposing
> counsel, and with the judge."

*McBride v. Superintendent, SCI Houtzdale,* 687 F.3d 92, 102-103 (3d

Cir. 2012) (citations omitted).

Given the deference owed to counsel, "counsel's strategic choices will not be

second-guessed by *post-hoc* determinations that a different trial strategy would have

fared better." *Rolan v. Vaughn*, 445 F.3d 671, 681-82 (3d Cir. 2006).   But "[o]nly

choices made after a reasonable investigation of the factual scenario are entitled to a

presumption of validity." *Id.* at 682.   Thus, "[u]nder *Strickland's*

objective-reasonableness prong, the question of whether counsel had a reasonable

strategy necessarily includes the question of whether that strategy was reasonably

arrived at." *Collins v. Sec'y of Pennsylvania Dep't of Corr.*, 742 F.3d 528, 547 (3d

Cir. 2014).

> [S]trategic choices made after thorough investigation of law and
> facts relevant to plausible options are virtually unchallengeable;
> and strategic choices made after less than complete investigation
> are reasonable precisely to the extent that reasonable
> professional judgments support the limitations on investigation.
> In other words, counsel has a duty to make reasonable
> investigations or to make a reasonable decision that makes
> particular investigations unnecessary.   In any ineffectiveness

case, a particular decision not to investigate must be directly
assessed for reasonableness in all the circumstances, applying a
heavy measure of deference to counsel's judgments.

*Strickland*, 466 U.S. at 690-91.

Here, it is apparent from Patterson's testimony at the PCRA hearing that he

had done no investigation into the Pocono Medical Center's blood-testing

procedures, he had no intention of examining the lab tech about whether the testing

procedures were on whole blood and, if not, whether she could provide a conversion

factor, and despite Superior-Court caselaw, he did not even know whether a

conversion factor would be necessary if the test was not on whole blood.   Given

Patterson's lack of investigation and research regarding the blood-testing

procedures, his strategic decision to stipulate to the BAC results was   not

reasonable.[9]   A reasonable attorney would not have stipulated to BAC test results

based on supernatant testing where the lab tech could not provide a conversion

factor.[10]   Accordingly, we conclude that Patterson's performance was deficient.

---

[9] We see nothing on the report of the blood test from the Pocono Medical Center that
would lead a reasonable attorney to conclude that the test was on whole blood, such
that an inquiry into the testing procedures was unnecessary.   *See Doc. 24-2*.

[10]   The proper inquiry is "into the objective reasonableness of counsel's
performance, not counsel's subjective state of mind." *Harrington*, 562 U.S. at
109-10.   We note, nevertheless, that Patterson admitted at the PCRA hearing that
had he known that the Pocono Medical Center tested just the supernatant, he would
have proceeded differently. *See Doc. 19* at 30 ("If I had known that, I would have

### 2. Prejudice.

In addition to establishing that Patterson's performance was deficient, in order to succeed on an ineffective-assistance-of-counsel claim, Boslet must show that he was prejudiced by Patterson's performance.   Whether Boslet was prejudiced by Patterson's performance is a mixed question of law and fact that we must review de novo. *See Thomas*, 570 F.3d at 127 (stating in a case where 2254(d) did not apply that it reviews "*de novo* the mixed question of law and fact of whether Thomas can show prejudice").

The burden is on Boslet to show that he was prejudiced by Patterson's performance. *Wong v. Belmontes*, 558 U.S. 15, 27 (2009) ("*Strickland* places the burden on the defendant, not the State, to show a 'reasonable probability' that the result would have been different.").   Here, given the lack of evidence of whether, if Patterson had not stipulated to the BAC, the Commonwealth would have been able to present a conversion factor, Boslet has not met that burden.

If Patterson had not stipulated to the BAC report and if the Commonwealth had relied merely on the testimony of Druffner at trial, that testimony would not have been sufficient to support a conviction for DUI-High Rate of Alcohol because, as is apparent from Druffner's testimony at the PCRA hearing, she would not have

explored it and then combat the general impairment with the bad stop.").

been able to testify about a conversion factor.   But Judge Zulick concluded that the

Commonwealth would have had the opportunity to call an expert to establish a

conversion factor and Boslet had not presented evidence that the Commonwealth

could not have done so.   The respondent does not address this issue arguing only

that defense counsel's trial strategy was reasonable.   Considering the issue de novo,

we reach the same conclusion as Judge Zulick.

Patterson testified that he had subpoenaed Druffner to testify at trial, but he

did not call her after the stipulation.   We do not know who, if anyone, the

Commonwealth would have presented as a witness to establish Boslet's BAC if

there had not been a stipulation.   Boslet has not pointed to evidence as to whether

the Commonwealth had an expert other than Druffner ready to testify at trial.

Boslet simply did not establish at the PCRA hearing whether the Commonwealth

would have been able to present a conversion factor or whether the conversion factor

would have lowered his BAC below the threshold necessary for conviction.   Thus,

we conclude that Boslet has not shown a reasonable probability that the result of the

trial would have been different had Patterson investigated the blood-testing

procedure and called Druffner to testify.

Based on the exchange between counsel and the court at the PCRA hearing,

we have some doubt about whether the Commonwealth could or would have

46

presented a conversion factor had Patterson not stipulated to the BAC.   During the

closing arguments after the testimony was presented at the PCRA hearing, Judge

Zulick stated that he did not know whether, if there had not been a stipulation, the

Commonwealth would have called another witness at trial to provide a conversion

factor, and Boslet's PCRA counsel suggested that it would not have:

> MR. REISH:   I would suggest they still don't believe
> they need a conversion factor because they've taken that position
> through the witness today, and I think the case law disagrees
> with them, if they still believe this is whole blood.

*Doc. 19-3* at 44.   The Commonwealth was not clear about whether it believed a

conversion factor was necessary:

> MR. MATTHEWS:   Your Honor, the Commonwealth is
> not saying that the test was done on whole blood.   The witness
> has testified as an expert in this county and many other counties
> and has been doing this for 17 years testifying that tests were
> performed on whole blood.   The Commonwealth has a case,
> *Commonwealth versus Karns*, 50 A3d 158, and it states:   The
> general rule for alcohol related DUIs is that only tests performed
> on a [sic] whole blood will sustain a conviction, under 3802.
> The next sentence, does evidence of blood, serum, plasma or
> supernatant tested without a conversion will not suffice.   The
> witness testified that she began with whole blood as opposed to
> plasma, and she described the difference between plasma and
> whole blood.   The Commonwealth is arguing that the witness
> began with whole blood and that is a test that was performed by
> the Pocono Medical Center, that's been approved by [the]
> Pennsylvania Bulletin for all the years that it's performed these
> testes and that is what the Commonwealth is relying on.

47

Case 1:13-cv-02532-WWC   Document 30   Filed 05/27/16   Page 48 of 51

          If the *Karns* case has changed something, that's a 2012
     case and this case went to trial in, I believe, 2011.   I'm not sure
     we can now argue that this case is binding.   I'm not sure of the
     date that defense counsel has on a case that they are citing.

*Id*. at 46-47.   After Boslet's PCRA counsel pointed out that *Renninger* was decided

in 1996, the Commonwealth asserted:

          MR. MATTHEWS:   The Commonwealth would also
     would suggest that even this counsel has had DUI cases where
     either they plead guilty or they went into ARD, we actually had a
     DUI trial and this issue was never raised, or whatever strategy
     there may be to now argue that it's ineffective assistance of
     counsel not to cross-examine the witness on that evidence I don't
     believe is appropriate.   It's never been done.   I'm not saying
     never done in this county, but I'm suggesting this attorney nor
     any other attorney has never raised this issue before this day and
     they pled people out, had them go ARD, gone to jury trials and
     those individuals have been found guilty.   I don't know how we
     can now say that's all ineffective assistance of counsel.   For
     whatever reason they made those decisions at this time.

*Id*. at 47-48.   Boslet's PCRA counsel then responded that he raised the issue in two

other cases and that it should have been an issue at Boslet's trial, after which the

following exchange took place:

          MR. MATTHEWS:   But it goes to whether there's a
     reason for bringing it in.
          MR. REISH:   He had a trial.
          MR. MATTHEWS:   Mr. Patterson testified as to his
     reasoning for why he stipulated to the results.   Other counsel
     may have people go ARD, they may make that reason not to
     challenge the stop or the blood.
          THE COURT:   He clearly had a strategy as to why he
     didn't oppose the blood test here and obtained a not guilty on the

general impairment and the two traffic tickets and then had a
strategy how he was going to defeat the conviction on the BAC.
    So I know one of the threads in a PCRA case is whether
counsel had a reasonable strategy he was pursuing and during the
course of the trial as it developed, and I agree that he definitely
had a clear strategy about how he was going to accomplish an
overall win, and overall not guilty in this case, and he was going
to do it by getting a not guilty on the general impairment and the
traffic tickets and hoping for the best with the Superior Court.
    MR. MATTHEWS:   That's the same along the lines
someone's going ARD, we won't fight the stop or we wont' [sic]
fight the blood and they [go] to ARD or go to trial hoping to get a
not guilty verdict on some other issue, and it doesn't work out.

*Id*. at 48-49.

Although the Commonwealth started out by stating that it was not contending

that the blood test in this case was done on whole blood, the entire exchange leaves

us unsure of the Commonwealth's position.   But the statements made by counsel

during argument are not evidence, and Boslet has not provided any evidence that had

there not been a stipulation, the Commonwealth would not have called an expert to

establish a conversion factor.   We note that in his PCRA petition, Boslet listed the

prosecutor—Mr. Matthews—as a potential witness, *see doc. 22-3* at 7, but he did not

call Matthews at the PCRA hearing.   Nor did he ask for a stipulation from the

Commonwealth that it would not have called an expert to establish a conversion

factor.

In sum, Boslet has not shown that he was prejudiced by Patterson's conduct at trial.   Accordingly, Boslet is not entitled to habeas relief on his claim of ineffective assistance of counsel.

## V. Recommendation.

For the foregoing reasons, **IT IS RECOMMENDED** that Boslet's petition for a writ of habeas corpus be **DENIED**.

The Parties are further placed on notice that pursuant to Local Rule 72.3:

Any party may object to a magistrate judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof.   Such party shall file with the clerk of court, and serve on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections.   The briefing requirements set forth in Local Rule 72.2 shall apply.   A judge shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge.   The judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record.   The judge may also receive

further evidence, recall witnesses or recommit the matter to the
magistrate judge with instructions.

Submitted this 27th   day of May, 2016.


                                        **_S/Susan E. Schwab_**
                                        Susan E. Schwab
                                        United States Magistrate Judge